[Civ. No. 53223. First Dist., Div. Three. Aug. 24, 1983.]

AARON R. LEVIN et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

**COUNSEL**

Elliot D. Pearl and Robert A. Seligson for Plaintiffs and Appellants.

Richard G. Rypinski, Robert F. Carlson, Ronald I. Harrison, Gordon S. Baca, George L. Cory and Richard A. Wehe for Defendant and Respondent.

**OPINION**

**FEINBERG, J.**—Plaintiffs[1] appeal from a judgment of dismissal in favor of the state[2] after the court granted the state's motion for summary judgment in Levin's action for wrongful death. For the reasons set forth below we

---

[1] Aaron is the husband, and David and Sara are the children of the decedent, Marcia J. Levin.

[2] The other defendants named by the original complaint have been dismissed in the interval between the filing of the complaint in 1976 and the filing of the instant appeal in 1981.

reverse as we have concluded that there are triable issues of fact as to the design immunity defense (Gov. Code, § 830.6.).[3]

■ In reviewing a summary judgment, we are limited to the facts shown in the affidavits and those admitted and uncontested in the pleadings. We determine only whether the facts so shown give rise to a triable issue of fact. Moreover, the moving parties' papers are strictly construed, while those of the opposing party are liberally construed. ■ A summary judgment is a drastic procedure to be used with caution, and doubts as to the propriety of granting the motion are resolved in favor of the party opposing the motion. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953].) ■ An appellate court will reverse a summary judgment if any kind of a case is shown. (4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 199, p. 2844; *Fosgate* v. *Gonzales* (1980) 107 Cal.App.3d 951, 954-955 [166 Cal.Rptr. 233].)

■ ■ ■ ■ Examining the affidavits and counteraffidavits in light of the established rules we must determine whether the state has met its burden of establishing its immunity from liability.[4]

About 5 p.m. September 25, 1975, Dr. Marcia J. Levin was killed when the automobile she was driving went over an embankment after a head-on collision on a portion of State Highway 37, known as the Black Point cutoff, an east-west roadway. She was traveling on the outside (No.2) eastbound lane when she was struck by a westbound vehicle that had illegally crossed the double yellow line into her lane of travel; M. Townsend, the driver of the westbound vehicle, had a blood alcohol level of .12 percent. She was driving at a lawful speed, and in a reasonable manner, and tried to avoid the collision swerving to her right, but went over a steep embankment into the channel from which the embankment had been excavated. The channel

---

[3]At the time of the instant accident, Government Code section 830.6 read, so far as pertinent, as follows: "Neither a public entity . . . is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction . . . *by some . . . employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved,* if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." (Stats. 1963, ch. 1681, § 1, p. 3272.) (Italics added.)

[4]We need not discuss Levin's contention that the court abused its discretion by denying the request for findings and conclusions of law. Levin cites no authority for his contention. In ruling on a motion for a summary judgment, a court is without power to make findings of fact. (*Allis Chalmers Corp.* v. *City of Oxnard* (1981) 126 Cal.App.3d 814, fn. 2 at p. 818 [179 Cal.Rptr. 159].)

was about ten feet deep and contained water about four feet deep. Dr. Levin's car overturned and she died from drowning.

█ So far as here pertinent, Government Code section 835 provides that a public entity is liable if the plaintiff establishes that: (1) the property was in a dangerous condition at the time of the injury; (2) the injury was proximately caused by the dangerous condition; (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury incurred; and (4) the public entity had actual or constructive notice of the dangerous condition under section 835.2,[5] a sufficient time prior to the injury to take measures to protect against the dangerous condition.

█ The elements of the design immunity defense here pertinent are: (1) a causal relationship between the design and the accident; (2) the approval of the design in advance of the construction by an officer exercising discretionary authority; and (3) substantial evidence of the reasonableness of the design. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 574 [136 Cal.Rptr. 751]; *De La Rosa* v. *City of San Bernardino* (1971) 16 Cal.App.3d 739, 747 [94 Cal.Rptr. 175].)

A. Causal Relationship

The design feature at issue is the 1974 reconstruction of the portion of Route 37 in issue, and more specifically, the absence of a median barrier and guard rails. A brief factual review is required. In 1967, Highway 37 consisted of a two-lane roadway with 24 feet to 26 feet of concrete pavement and practically no shoulders. A five-year study of accidents ending December 1966, showed that the route compared favorably with the statewide average for two-lane rural facilities, but the fatality rate was triple the statewide average. In 80 percent of the accidents, the absence of shoulder was a major or contributing factor. In 1969, the severity of most of the existing curves was reduced and eight-foot shoulders were added on the north and south sides of Highway 37. At this time there were two 12-foot lanes of east-west travel and an 8-foot shoulder on the north and south sides.

The 1972 and 1973 reports of the Department of Highways stated that between January 1970 and October 1972 there were 86 accidents on the stretch of Highway 37 here in issue; of these 21 were passing accidents. The fatality rate of the accidents on this stretch was almost double the statewide average. There were also frequent queues because of slow moving

---

[5]In relevant part Government Code section 835.2 provides that the public entity had constructive notice only if the plaintiff established that the condition existed for such a long time and was of such an obvious nature that the public entity should have discovered it in the exercise of due care.

vehicles and the volume of traffic. N. Anderson, the state's district engineer, recommended the addition of a passing lane (alternating 1.3 - 1.4 miles in each direction), from a portion of the original lane, and the addition of a new eastbound lane south of the passing lane, with the elimination of the eight-foot shoulder on the south side. These changes were made in 1974.

Levin's opposition to the motion was accompanied by the deposition of an expert, Neuman, a professor of civil engineering. Neuman stated at the time of the accident, there were 3 lanes of travel: 1 westbound lane was 11 feet wide; the inner (No.1) eastbound lane was 12 feet wide and the outer (No. 2) eastbound lane was 11.5 feet wide. On the south side there was only three feet of paved shoulder and two feet of unpaved portion, the top of the embankment. The distance from the top of the embankment to the water in the channel below was 11 feet. Neuman opined that Highway 37 was in a dangerous condition at the time of the accident because: (1) there was no shoulder for emergency use in the eastbound direction; (2) there was no protection on the south side to prevent vehicles from going over the steep embankment into the ditch. There should have been a paved shoulder eight to nine feet wide and an unpaved shoulder of one to two feet; and if a shoulder was not economically feasible, a guardrail should have been placed along the south edge of the road, as well as twenty-eight-inch high metal beam. The four-foot deep water at the base of the steep embankment pointed to a guardrail to prevent a car from turning over and trapping its occupant; the channel that was dug to create the roadway also posed a danger.

In Neuman's opinion, before the state changed the roadway in 1974, it did not conduct a true study or consider alternatives; rather, a prior determination to add passing lanes was made and followed. The south shoulder was deficient and substandard and should have been provided with guardrails. The conditions described in the Division of Highways 1971 Traffic Manual, promulgating standards (warrants) for guardrails[6] were present, and should have been followed.

---

[6]Section 7-01.1 stated in pertinent part:

"Guardrail is installed in State highway embankments and adjacent to fixed objects to reduce the combined effect of severity and frequency of *'ran-off-road' type accidents*. This is accomplished by deflecting a vehicle away from the embankment slope or the fixed object and dissipating the energy of the errant vehicle. . . .

"*Guardrail will reduce accident severity only for those conditions where the severity of striking the guardrail is less than the severity of leaving the roadway, going down the embankment,* or striking the fixed object. . . ."

Section 7.01.2, pertaining to "embankment guardrails" stated in pertinent part:

"The *primary contributors to embankment accident severity are the height and slope* of the embankment or side hill.

"Figure 7-1, Slope Severity Determination, compares the accident severity of hitting guardrail with the severity of going off an embankment. The lines shown on Figure 7-1 represents the combinations of embankment height and slope which result in accident sev-

Faustmans, a consulting traffic engineer, agreed that Highway 37 was in a dangerous condition at the time of the accident and presented a substantial risk of injury even when used with due care. In August 1964 the State Traffic Department reported that .12 fatal cross median accidents per mile per year is a high rate and normally median barriers are installed when this figure is reached. The portion of Highway 37 involved here had a .5 fatal cross median accident rate, four times the above mentioned "high" rate.

The state maintains that there was no causal relationship between Dr. Levin's fatal accident and the absence of the eight feet shoulder and guardrails. The state argues that the accident was caused only by the unlawful driving of Townsend. The state's argument ignores the obvious fact that the absence of guardrails mandated by its own standards, the high embankment and the ditch with four feet of water in it, could have been contributing causes after Dr. Levin attempted to avoid a head-on collision. Thus the record indicates a causal relationship between the accident and the state's 1974 modification of Highway 37.

Further in *Ducey* v. *Argo Sales Co.* (1979) 25 Cal.3d 707 [159 Cal.Rptr. 835, 602 P.2d 755], our Supreme Court held that under Government Code section 835, the state properly could be held (at pp. 717 -718) liable for failing to erect a median barrier to protect freeway drivers from the serious injuries inherent in cross-median accidents. In *Ducey,* as here, the plaintiffs adduced evidence that the condition of the state's property created a substantial risk of injury even when the property was used with due care.

B. Approval of the Design in Advance by an Officer Exercising Discretionary Authority.

This second element of the defense is the major focus of the contentions on this appeal. The record indicates that the 1974 changes were recommended by the district engineer, N. Anderson, and approved by J.A. Legarra, the deputy highway engineer who had the authority to do so.

The state relies primarily on the deposition testimony and reports of Victor Graf, who was the state's senior transportation engineer from July 1968 through July 1974, when the 1974 modifications of Highway 37 were approved. Graf's responsibilities included reviewing district proposals, and making recommendations or comments from the standpoint of traffic services and safety. On the 1974 Highway 37 project, Graf was only a con-

erities equal to average guardrail accident severity. The guardrail accident severity is derived from accident data. It indicates that overall accident severity will be less if guardrail is used on embankments which plot above the line. On the other hand, accident severity will be less for the embankments without guardrail which plot below the line." (Italics added.)

sultant, and had no authority to disapprove the report of the district engineer.

Graf reviewed and approved the passing lane project prior to its submission to Legarra. In his review, Graf specifically considered the placement of a median barrier and exterior guardrails, but concluded that neither was advisable on this particular stretch of Highway 37. In Graf's opinion, either a median barrier or guardrails would have the effect of increasing accidents, hindering emergency vehicle travel and could induce wrong-way movements. Graf made no proposals to compensate for the loss of the eight-foot shoulder on the south because he was not told to do so. He was not asked to make recommendations on this project, but only to provide for passing lanes.

The state has not challenged the existence and application of the above quoted guardrail standards. Graf's declarations and testimony do not mention them or the degree of the steep slope created by the embankment, which was created by the 1974 construction. There was no evidence that Legarra had discretionary authority to disregard the standards.

■ As our Supreme Court pointed out in *Cameron* v. *State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777], the rationale of the design immunity defense is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design. An actual informed exercise of discretion is required. The defense does not exist to immunize decisions that have not been made. Here, as in *Cameron, supra,* the design plan contained no mention of the steep slope of the embankment. The state made no showing that Legarra, who alone had the discretionary authority, decided to ignore the standards or considered the consequences of the elimination of the eight feet shoulder. It follows that the state also failed to establish the second element of the defense.

C. Substantial Evidence of the Reasonableness of the Design.

■ Given the silence of the state's experts as to the embankment and its slope, there is no evidence that reasonably inspires confidence or is of solid value (*Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 797-800 [101 Cal.Rptr. 358]) as to the third element of the defense. Further, the mere fact that an expert witness testifies that in his opinion, a design is reasonable, does not make it so. (*Ibid.*) Here the record reveals a conflict between Levin's experts and the state's as to the reasonableness of the design. Given the history of the stretch of Highway 37 here involved and changes made in 1974, there was also evidence that the state had actual or constructive notice of the dangerous conditions.

The judgment is reversed.

White, P. J., and Scott, J., concurred.

A petition for a rehearing was denied September 19, 1983, and respondent's petition for a hearing by the Supreme Court was denied October 19, 1983.