Filed 10/29/13  Wolkoff v. State of Cal.Dept. of Transportation CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JERALD WOLKOFF et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE OF CALIFORNIA DEPARTMENT OF TRANSPORTATION, <br><br> Defendant and Respondent. | A131602 <br><br> (San Mateo County Super. Ct. Nos. CIV481154 & CIV486741) |

Plaintiffs Jerald Wolkoff, Sandra R. Wolkoff, and Cindy Burkowski (collectively, plaintiffs) appeal from the trial court's grant of summary judgment in favor of defendant State of California Department of Transportation (CalTrans).  The dispute stems from a June 21, 2008, multi-vehicle collision on State Route 1 near the Green Oaks Way intersection in San Mateo County.  Santiago Nabor was driving southbound on State Route 1 approaching an intersection at Green Oaks Way.  Jeffrey Bluestone was stopped in the southbound lane of State Route 1 waiting to make a left turn onto Green Oaks Way.  Nabor's vehicle hit the left rear of Bluestone's vehicle and then entered the northbound lane of traffic, where it collided with a car being driven by Burkowski, in which Steven N. Wolkoff was sitting in the front passenger seat.  Plaintiffs allege Steven Wolkoff died as a result of the injuries he suffered in the collision and Burkowski was seriously injured.

The trial court granted summary judgment because it concluded CalTrans established a complete defense based on design immunity.  When a public entity is sued

1

for a personal injury caused by a dangerous condition of its property, it may establish a complete defense of design immunity pursuant to Government Code section 830.6 (section 830.6), which states in relevant part:

"Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." (§ 830.6.)

A public entity claiming design immunity pursuant to section 830.6 "must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 69 (*Cornette*); § 830.6.)

Plaintiffs argue reversal is necessary because CalTrans did not establish the second and third elements of this defense. We agree that CalTrans, the moving party, did not meet its initial burden of production regarding whether there was substantial evidence of the reasonableness of the subject roadway, the third element, because of its failure to address the placement of the Green Oaks Way intersection in the area where State Route 1 transitioned from two lanes to one lane. Therefore, we reverse.

## BACKGROUND

In June 2009, Jerald Wolkoff and Sandra R. Wolkoff (collectively, the Wolkoffs) filed a first amended complaint against CalTrans and other parties. Two months later, Burkowski sued CalTrans and others as well. The Wolkoffs and Burkowski each brought a cause of action against CalTrans for dangerous condition of public property, that being

State Route 1 near the intersection of Green Oaks Way. They alleged that at the time of the accident, this public property "was in a dangerous condition in that the roadway design provided high speed passing lanes to merge to a single lane within a short distance of a crest of a hill and where vehicles making left turns onto an intersecting road would occur." According to plaintiffs, "This area created and constituted a 'trap' for motorists using the roadway with due care . . . . CalTrans provided no warning of left turning vehicles at a point just over the crest of a hill where two passing lanes merged into a single southbound lane." Also, they alleged, CalTrans had notice of this dangerous condition, and knew or should have known of its dangerous character in sufficient time prior to June 21, 2008, to have taken measures to protect against the dangerous condition.

The Wolkoffs further alleged that, as a legal and proximate result of the dangerous condition existing on State Route 1, their son, Steven N. Wolkoff, was seriously injured in a car collision and subsequently died and, as a result, the Wolkoffs sustained serious losses and damages and other expenses.

Burkowski added in her complaint that "[t]he two southbound passing lanes did not extend past the intersecting Green Oaks Way. They merged into a single southbound lane too abruptly for safe passage by southbound vehicles around traffic stopped or stopping to turn onto Green Oaks Way. The taper or transition area is dangerously short. [CalTrans] did not provide a turn pocket for southbound traffic turning onto Green Oaks Way nor any other means to safeguard southbound Hwy 1 traffic traveling past said intersection." She alleged that, as a legal and proximate result of the dangerous condition, she suffered catastrophic injuries in a car collision and other damages. She also brought causes of action against CalTrans for negligent infliction of emotional distress and "property damage and loss of use."

CalTrans answered each complaint. Among other things, it alleged the affirmative defense of design immunity pursuant to section 830.6.

CalTrans subsequently moved for summary judgment separately against the Wolkoffs and Burkowski based on the design immunity defense. The parties' arguments and factual contentions were very similar, and the motions were heard together. Prior to

3

the court ruling on the motions, it ordered, based on the parties' stipulation that their cases be consolidated for all purposes. The court granted CalTrans's motions and entered judgment in CalTrans's favor. Plaintiffs filed a timely appeal.

## DISCUSSION

As noted above, plaintiffs argue the trial court erred in granting summary judgment because CalTrans did not establish the second and third elements. We conclude CalTrans did not establish the third element, in that it did not make a prima facie case that substantial evidence showed the reasonableness of the design of the roadway in the area of the collision. We do so because CalTrans did not provide any substantial evidence showing the placement of the Green Oaks Way intersection in the area where State Route 1 tapered down from two lanes to one lane, referred to as the "transition area," was reasonable. Therefore, we reverse on this ground.

## I. *Relevant Legal Standards*

A trial court properly grants summary judgment if the record establishes no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*), fn. omitted.)

Generally, a defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if [it] carries [its] burden of production, [it] causes a shift, and the opposing party is then subjected to a burden of production of [its] own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar*, *supra*, 25 Cal.4th at pp. 850–851.) Although the burden of production shifts, the moving party always bears the burden of persuasion. (*Id*. at p. 850.)

4

A moving party defendant such as CalTrans is entitled to summary judgment if it establishes a complete defense to the plaintiff's causes of action. (*Aguilar*, *supra*, 25 Cal.4th at p. 849.) This burden "is heavier than the burden to show one or more elements of the plaintiff's cause of action cannot be established. . . . '[T]he defendant has the initial burden to show that undisputed facts support *each element* of the affirmative defense.' [Citations.] The defendant must demonstrate that under no hypothesis is there a material factual issue requiring trial. [Citation.] If the defendant does not meet this burden, the motion must be denied. Only if the defendant meets this burden does 'the burden shift[] to plaintiff to show an issue of fact concerning at least one element of the defense.' " (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289-290.)

We review de novo an order granting or denying summary judgment. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) In determining whether the parties have met their respective burdens, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We liberally construe the evidence in support of plaintiffs as the parties opposing summary judgment and resolve any doubts in their favor. (*Johnson v. American Standard, Inc*. (2008) 43 Cal.4th 56, 64.)

Thus, we apply "the same three-step analysis required of the trial court. ' " 'First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond . . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " ' " (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503.)

Plaintiffs argue the trial court should not have granted summary judgment because, among other things, CalTrans did not present substantial evidence of

reasonableness. " 'In determining whether evidence . . . is substantial, the question is whether the evidence "reasonably inspires confidence" and is of "solid value." [Citation.]' [Citation.] Typically, 'any substantial evidence' consists of an expert opinion as to the reasonableness of the design, or evidence of relevant design standards." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1264.) However, "the mere fact that an expert witness testifies that in his opinion, a design is reasonable, does not make it so." (*Levin v. State of California* (1983) 146 Cal.App.3d 410, 418 (*Levin*).)

## II. *The Proceedings Below Regarding Reasonableness of Design*

Plaintiffs argue the roadway design in the area of the collision was not reasonable for a number of reasons, including because it called for a shortened transition area; placed the merging of two lanes into one lane at the crest of hill just north of the Green Oaks Way intersection, from which there was limited visibility of the area ahead; placed the Green Oaks Way intersection in the transition area; did not provide for a left turn pocket at the intersection; and did not provide signs warning drivers that left-turning vehicles could be stopped at the intersection.

We focus on one of plaintiffs' contentions, which they raised in their complaints and oppositions to CalTrans' summary judgment motions, and have raised in this appeal: that placement of the Green Oaks Way intersection in the transition area was a part of the dangerous condition.

## A. *CalTrans's Motions for Summary Judgment*

In its motions for summary judgment, CalTrans did not specifically address plaintiffs' allegations that "the roadway design provided high speed passing lanes to merge to a single lane . . . where vehicles making left turns onto an intersecting road would occur." In its separate statement of undisputed material facts, CalTrans made the general contentions that the area of the roadway was created by construction in accordance with a plan and/or design of construction; these plans were approved in advance of construction by State of California employees vested with discretionary authority to do so; and "[t]he approval of these plans and/or designs was reasonable."

6

CalTrans relied entirely on certain paragraphs of the declaration of Richard F. Ryan for these contentions.

In his declaration, Ryan stated that he has been a registered civil engineer since 1979 in Wisconsin and since 1991 in California. His past work included being a consultant for the State of California from 1989 to 1993 and a CalTrans employee from 1993 to 1998, during which he had numerous responsibilities related to highway issues.

In the parts of his declaration that CalTrans cited in its separate statement as support for the reasonableness of design, Ryan stated that the roadway in the area of the collision was subject to construction work performed under four separate "contracts," which he also referred to as "plans." They were approved in 1955, 1959, 1980, and 1990. According to Ryan, "all four sets of plans conformed to the design guidelines in effect when the plans were approved for construction." At the end of his discussion of each contract, he stated, "All work was constructed pursuant to the plans and guidelines in effect at the time."

For each plan, Ryan identified specific individuals, including registered civil engineers, vested with the discretionary authority to sign and approve the plans in advance of construction, indicated the plans were approved prior to construction, and attached "As-Built" plans for the project to his declaration. Ryan indicated elsewhere in his declaration that, in preparation of his declaration, he had reviewed a large number of documents, including the parties' complaints, certain discovery, and CalTrans design manuals and/or traffic manuals in effect as of the dates of each of the four contracts. He attached to his declaration what he identified as relevant portions of state manuals, including for highway design and/or traffic for these plans.

Regarding each of the contracts approved in 1955 and 1959, Ryan referred to specific design standards for speed and stopping sight distance. He stated that the design conformed with the design speed standards and minimums for stopping sight distance in the relevant manuals. Ryan stated that the 1959 contract "used the first profile and constructed the additional passing lanes and transition in the area of the subject accident."

7

Regarding each of the contracts approved in 1980 and 1990, Ryan stated it did not change the profile from the original design, but that "the transition was changed during this contract." He followed this in each case with the statement, "See below for discussion." He subsequently stated regarding the 1980 contract, "Per the Highway Design Manual in effect at the time . . . the transition length should equal 12V, where 'V' is the design speed . . . . Thus, a taper would have needed to be 720 feet long to conform to the guidelines. As the pavement transition was later replaced it is irrelevant what was constructed."

Ryan then stated the transition length called for in the 1990 contract, indicating it was the same: "Per the Highway Design Manual in effect at the time . . . the transition length should equal 12V, where 'V' is the design speed . . . . Thus, a taper would have needed to be 720 feet long to conform to the guidelines. Per the plans, the pavement transitions were 720 feet long and thus were in conformance with the Highway Design Manual at the time the plans were approved for construction. Attached as Exhibit N as noted above are the portions of the manual dealing with pavement transitions."

Ryan indicated the 1990 contract was approved by project engineer H.X. Nguyen, who "was delegated with the authority to approve this contract. H.X. Nguyen was a registered civil engineer and was vested with the discretionary authority to sign and approve these plans, in advance of construction. This work could not proceed without their approval. This plan was approved prior to the opening of the bids for contract[.]"

Ryan did not discuss how the transition was changed in the 1990 contract. He also did not discuss the issue of the Green Oaks Way intersection being, or not being, in the transition area. Included in his exhibit N, but not referred to by Ryan in his declaration, is part 206.1, entitled "General Transition Standards." It states in part that "[t]he design should be such that intersections at grade within the transition area [should be] avoided."

In a part of his declaration, which CalTrans did not rely on in its separate statement as support for the reasonableness of the roadway design, Ryan stated that the collision location did not appear on any safety system monitoring the state highway system for high concentrations of accidents; only nine accidents occurred in the nine

8

years and five months before the collision, in irrelevant circumstances and/or well beyond the vicinity of the area of the collision; and 18,700,000 vehicles had driven past the subject location in this time period, none of which were involved in an accident.

At end of his declaration, in another part not relied on by CalTrans in its separate statement, Ryan further asserted, "I have reached a number of opinions as I have examined this location." These included that "[t]he subject location was properly designed and constructed in accordance with the criteria in effect at the time" and "[a]ll the designs were reasonable and in conformance with the criteria in effect at the time of design and construction."

In its briefs below, CalTrans contended there was "ample evidence here supporting the reasonableness of the highway design. Pursuant to the declaration of [Ryan], a civil engineer with 35+ years of experience, the plans were reasonable and the approvals of these plans were reasonable. The design of the highway met the standards that were in place at the time of its construction." CalTrans did not refer to any particular standards in its discussions. CalTrans also referred to Ryan's conclusions that there was no history of similar accidents in the area of the collision.

## B. *Plaintiffs' Oppositions*

Plaintiffs filed opposition papers that were similar in content. Both disputed CalTrans's assertion in its separate statement that approval of the subject plans and/or designs was reasonable. They did so in part because "[t]he state moved the taper transition 200 [feet] south, where it included the Green Oaks Way intersection into the taper without taking measures to safeguard against the hazards the change created." They also stated in their own lists of undisputed facts that the transition was relocated roughly 200 feet south in the 1990 project, the transition from two lanes to one lane still occurred at the point where Green Oaks Way intersected with State Route 1, and there was substantial evidence that the plans, if approved, "were never designed in conformance with reasonable engineering practices or the numerous CalTrans' [*sic*] standards."

In making these contentions, plaintiffs relied on a number of sources. First, they cited the deposition testimony of Tomio Tsuda. Tsuda, whom the parties agree was a

9

CalTrans employee (CalTrans contends he was an engineer), indicated that he reviewed the 1990 plans. He stated that the "passing lane was . . . located 200 feet further to the south from what had existed on the roadway" before the 1990 project. Plaintiffs also cited to the deposition testimony of Dwight Caldwell, produced by CalTrans as the person most knowledgeable about "passing and merging on the subject road." Caldwell indicated that "the intersection of Green Oaks Way to State Highway 1 is within the transition from two lanes to one lane."

Finally, plaintiffs relied on the declaration of Harry J. Krueper, Jr. Krueper declared that he was a civil engineer licensed in a number of states, including California. Krueper stated he had been engaged "in the field of civil engineering, construction practices, traffic engineering, highway design and safety evaluation, accident reconstruction and pedestrian safety evaluation studies for the last 49 years," and was familiar with "the accepted manuals, texts and other published literature that is utilized by practicing engineers in the design and safety operational aspects of . . . highways in California, including the minimum design standards of CalTrans."

Krueper also indicated he had reviewed Ryan's declaration and the attached exhibits, as well as the Tsuda deposition transcript, among other things. He stated that, based on his review of Tsuda's deposition, "during the 1990 resurfacing of the subject roadway, the passing lane was moved 200 [feet] south. This would have had the effect of pushing the transition 200 [feet] south, which made Green Oaks Way fall within the transition." According to Krueper, doing so "without taking any measures to safeguard against the hazards this change created, was not reasonable." Furthermore, it (along with other deficiencies found by Krueper) was not reasonable "in accordance with the relevant state criteria in effect at the time of design, approval, and construction," and "fell well below prudent engineering standard and practice."

In their opposition briefs, plaintiffs contended, among other things, that the design was not reasonable because "[d]uring the 1990 project the taper was moved 200 feet south. The repositioning of the taper put Green Oaks Way within the transition."

10

Moving the transition south in 1990 "exacerbated a deadly design and helped set the trap for the motoring public."

## C. *CalTrans's Replies*

In its reply briefs, CalTrans did not address the movement of the transition area 200 feet south in the 1990 project or the resulting placement of the Green Oaks Way intersection in the transition area.[1] It also did not submit a response to plaintiffs' disputed facts regarding CalTrans's separate statement of undisputed facts or to plaintiffs' additional lists of undisputed facts. It did submit a supplemental declaration by Ryan, but this did not address these issues either.

In its reply papers, CalTrans also submitted, via a declaration, excerpts of deposition testimony by Nguyen and Tsuda. The excerpts did not refer to these specific issues either. Nguyen[2] indicated he was a project engineer on the 1990 project, which he

---

[1] In its tentative ruling on the motions, the trial court ordered that the parties could submit supplemental briefing on issues designated by the court, which did not include the southward movement of the transition in the 1990 project or placement of the intersection in the transition area. Nonetheless, in their supplemental papers, plaintiffs made further arguments regarding such things as the reasonableness of the roadway design, including based on additional evidence and supplemental lists of undisputed facts submitted. CalTrans objected to the additional evidence submitted by Burkowski on a variety of grounds. Although the court did not expressly rule on CalTrans's objections, it stated in its final order that plaintiffs "exceeded the scope of" its order regarding supplemental briefing. We construe this as the court sustaining CalTrans's objections, which ruling plaintiffs do not challenge on appeal. Although plaintiffs cite to certain of this evidence in this appeal, such as the declaration of Mark Shattuck, we do not consider it in light of the court's ruling.

[2] In their oppositions, plaintiffs submitted excerpts of Nguyen's and Tsuda's deposition testimony, contending there was no evidence of proof of reasonableness prior to construction of the 1990 project because neither took responsibility for determining that the design of the roadway complied with safety standards. We do not further discuss this evidence and argument in light of our review of whether CalTrans met its initial burden of making a prima facie showing of substantial evidence of the reasonableness of the design.

Plaintiffs also cite to depositions to argue CalTrans did not establish the second element of the design immunity defense, an issue we do not discuss in light of our conclusion that CalTrans did not make a prima facie showing regarding the third element.

11

described as a "maintenance project resurfacing," and had no recollection of the project. He also testified that his signature and stamp on plans shown to him indicated that he "designed based on CalTrans standard," and that, as a project engineer, "we design based on CalTrans standards and criteria."

Tsuda testified that, in reviewing plans, he would "see construction details and all the different parts of the plans," "see all the design and traffic safety requirements," and, when checking a plan for the length of a taper or transition at the end of a passing lane, "check it with respect to the requirements at that time;" he said "they would have to conform to whatever was required by the design or traffic requirements." He would look at each page of the plans submitted to him, looking for "conformance with the requirements, design and traffic." He would not stamp approval of plans and sign them until they were final, if they complied with requirements. Shown a sheet of plans, apparently from the 1990 project, Tsuda, asked if he had any memory of the project, stated, "the only thing I recognized was my approval seal. That's—that's all I recall."

## D. *The Trial Court's Rulings*

As we have discussed, after hearing, the trial court granted CalTrans's motions for summary judgment. Relying on those portions of the Ryan declaration cited by CalTrans in its separate statement, it found that the Ryan declaration established a "prima facie case that there is substantial evidence on which the approval can be reasonably based." The trial court did not address the movement of the transition area 200 feet south in the 1990 project or the placement of the Green Oaks Way intersection in the transition area in its order or judgment.

## III. *CalTrans Did Not Meet Its Initial Burden Regarding the Reasonableness of the Design*

Contrary to the trial court's ruling, we conclude CalTrans, the moving party, did not meet its initial burden of production regarding whether there was substantial evidence of the reasonableness of the roadway design. We do so because CalTrans did not address the material allegation by plaintiffs that, a dangerous condition existed because of the

12

placement of the Green Oaks Way intersection in an area of State Route 1 that transitioned into one lane, where the collision occurred.

## A. *Ryan's Opinion Was Not Substantial Evidence on This Point*

Plaintiffs contend Ryan, although he addressed issues such as the sight distance and taper length of the roadway, "never opined" about, and no other evidence showed, the reasonableness of "CalTrans's movement of the transition, putting the left turn onto Green Oaks Way in the middle of the transition." Therefore, they continue, CalTrans did not present an expert opinion on the reasonableness of this aspect of the design of the roadway. We agree.

Despite plaintiffs' allegations in their complaints that the intersection's location in the transition area created a dangerous condition, which complaints Ryan indicated he had reviewed, he was silent on the issue in his declaration. This was so despite his own declaration statement that the transition was changed in the 1980 and 1990 projects, matters he indicated he would discuss further in his declaration, but did not. All that he discussed subsequently was the transition length, which he indicated was the same in both projects; therefore, these do not appear to have been the "changes" to which he alluded earlier in his declaration.

We are left, then, with Ryan's statements, in those parts of his declaration relied upon by CalTrans in its separate statement, that "all four sets of plans conformed to the design guidelines in effect when the plans were approved for construction" and, regarding each project, that "[a]ll work was constructed pursuant to the plans and guidelines in effect at the time." In light of Ryan's silence on the intersection's placement in the transition area and his failure to address the changes in the transition in 1990, despite his own reference to such changes, CalTrans does not establish that Ryan considered whether the placement of the Green Oaks Way intersection in the transition area was consistent with relevant standards. In other words, they do not establish that they submitted expert opinion on the issue.

Even if we were to construe Ryan's general statements as referring to the "intersection in the transition area" issue—which we do not—they still would not

13

constitute a prima facie showing of substantial evidence on the reasonableness of this aspect of the roadway design for two reasons. First, they are so conclusory as to be insubstantial; in other words, they are not "evidence that reasonably inspires confidence or is of solid value." (*Levin*, *supra*, 146 Cal.App.3d at p. 418 [Division Three of this district finding there was no substantial evidence of reasonableness of design, given the silence of the state's experts regarding particular design issues].) The mere fact that Ryan stated the design was in conformance with CalTrans guidelines "does not make it so." (*Ibid.*) " '[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' " (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 308 [finding in another context that an expert's declaration was insufficient to establish the nonexistence of a triable issue of material fact and, therefore, issuing a peremptory writ directing the trial court to deny defendants' motion for summary judgment])[3]

Also, even if we were to construe Ryan's statements as neither too general nor too conclusory, they are arguably contradicted by a portion of the exhibits he identified as relevant to the 1990 project, at least regarding the "intersection in the transition area" issue. Specifically, as we have discussed, a portion of the Highway Design Manual Ryan attached states that "[t]he design should be such that intersections at grade within the transition area should be avoided." Plaintiffs assert on appeal that this statement shows the 1990 project was not in conformance with CalTrans standards and guidelines, while CalTrans argues it does not apply to the physical circumstances, which were not "at

---

[3] The inadmissibility of problematic expert testimony was recently discussed by our Supreme Court, which supported a trial court's exclusion of expert testimony about future profits as speculative in *Sargon Enterprises, Inc. v University of Southern California* (2012) 55 Cal.4th 747. The Supreme Court noted that "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Id*. at pp. 771-772.) This court performs the same function on de novo review of a summary judgment.

grade," and its instruction was permissive in nature. Regardless of the parties' debate, which is based on argument rather than evidence, this statement at least arguably conflicts with any conclusion by Ryan that the placement of the Green Oaks Way intersection in the transition area was in conformance with the guidelines in effect at the time. In the absence of any explanation by Ryan for why the design was consistent with this provision, his general conclusion is insubstantial, particularly in light of our obligation to liberally construe the evidence in support of plaintiffs as the opposing parties and resolve any doubts in their favor. (*Johnson v. American Standard, Inc*, *supra*, 43 Cal.4th at p. 64; see also *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564 ["[a]n expert opinion has no value if its basis is unsound"].)

CalTrans argues that it met its prima facie burden regarding the reasonableness of the roadway design for three reasons, none of which are persuasive.

## B. *CalTrans's Expert Opinion and Engineer Certifications Are Insufficient*

CalTrans's first reason is that "it is well settled that the opinion of a civil engineer about the reasonableness of a design constitutes 'any' substantial evidence sufficient to support a design immunity defense." As legal support, CalTrans cites section 12.71 of the California Tort Liability Practice (Cont.Ed.Bar 4th ed. 2011), regarding dangerous condition of public property, refers generally to cases cited in a portion of that section, and specifically cites *Hefner v. County of Sacramento* (1988) 197 Cal.App.3d 1007.

Although CalTrans does not further explain the significance of these legal citations, we do not disagree with its legal proposition; indeed, it is similar to what we have quoted, *ante*, from *Laabs v. City of Victorville*, *supra*, 163 Cal.App.4th at page 1264. However, as recognized by the *Hefner* court, "appellate courts have rejected expert testimony ostensibly supporting design immunity where the testimony has been flawed sufficiently to destroy its substantiality." (*Hefner*, *supra*, 197 Cal.App.3d at p. 1015, citing *Davis v. Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789 and *Levin*, *supra*, 146 Cal.App.3d 410.) The issue here is not the law, but the lack of evidence submitted by CalTrans to meet its initial burden.

15

CalTrans cites a number of places in the record as supporting its contention that it presented sufficient expert opinion about the reasonableness of the roadway design. It first cites to Ryan's statements in his declaration. We have already discussed the reasons why this evidence was insufficient.

CalTrans also cites to excerpts from the depositions of Nguyen and Tsuda that it submitted with its reply papers below. This is not substantial evidence either for two reasons. First, as plaintiffs point out, CalTrans did not offer these excerpts in its separate statement below, and not until their reply brief. Typically, courts consider only those facts that are set forth in separate statements of undisputed facts, although we have the discretion to consider evidence not so included. (*Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 574-577.) We decline to exercise this discretion here. CalTrans gives us no reason to do so, and its failure to present these excerpts until its reply brief deprived plaintiffs of the opportunity to respond.[4] Notably, the trial court relied only on the portions of Ryan's declaration cited in CalTrans's separate statement for its determination of reasonableness.

Also, even if we were to consider the excerpts of Nguyen and Tsuda, neither actually states an opinion about the reasonableness of the design. While CalTrans may argue that their excerpts support its assertion that there was the requisite "discretionary approval" of the 1990 project (the second element of the design immunity defense, an issue which we do not address), both Nguyen and Tsuda acknowledged that they did not recall anything about the 1990 project. Their conclusory assertions that they would only have approved plans if they complied with prevailing standards and criteria are even weaker than those made by Ryan because of this lack of any recollection, and insufficient for the same reason that Ryan's conclusory statements are insufficient. (*Levin*, *supra*, 146 Cal.App.3d at p. 418; *Johnson v. Superior Court*, *supra*, 143 Cal.App.4th at p. 308.)

---

[4] The Wolkoffs filed objections to this and other evidence submitted by CalTrans with its reply because of CalTrans's failure to produce a new separate statement.

16

CalTrans also cites to a portion of its briefing below in reply to the Wolkoffs' opposition to its summary judgment motion. This briefing is argument, not evidence, and is unpersuasive.

## C. *CalTrans Has Not Explained Why the 1990 Contract Moved the Intersection Into the Transition*

CalTrans's second reason why it established the reasonableness of the design is that it submitted evidence that the designs met all professional standards, including regarding the roadway transition area. Once more, however, CalTrans relies on Ryan's statements in his declaration about the plans' compliance with CalTrans standards and criteria as evidence. As we have already discussed, this evidence is insufficient.

Also, CalTrans includes in its citations Ryan's "Exhibit N," which contains the portion of the Highway Design Manual that arguably contradicts Ryan, as it states, "The design should be such that intersections at grade within the transition area should be avoided." As we have discussed, this undermines the substantiality of Ryan's general statements about compliance.

CalTrans argues that we should not consider plaintiffs' contentions that this provision was violated by the placement of the Green Oaks Way intersection in the transition area because plaintiffs did not raise this issue below in their oppositions. We need not determine this waiver issue because we have focused our attention on whether CalTrans met its initial burden of production, and not whether plaintiffs raised disputed issues of material fact. Plaintiffs alleged the placement in their complaints and, therefore, CalTrans was obligated to provide contrary evidence in order to establish this aspect of its prima facie showing regarding the third element of the design immunity defense. (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851; *Anderson v. Metalclad Insulation Corp.*, *supra*, 72 Cal.App.4th at p. 289.)

CalTrans also asserts there was no evidence submitted below that the Green Oaks Way intersection was included in the transition area. This argument is unpersuasive for three reasons. First, plaintiffs so alleged in their complaints and, to the extent CalTrans might have intended to rely on this contention to show the reasonableness of the design, it

17

had the initial burden of showing the intersection was *not* included in the transition area. It did not do so.

Second, plaintiffs asserted the intersection was in the transition area in their opposition lists of undisputed facts below. Plaintiffs each supported their assertion with citations to excerpts from the depositions of Tsuda and Dwight Caldwell. As we have discussed, Tsuda indicated that the "passing lane was . . . located 200 feet further to the south from what had existed on the roadway" before the 1990 project. Caldwell, designated by CalTrans as the person most knowledgeable about "the passing and merging on the subject road," indicated that "the intersection of Green Oaks Way to State Highway 1 is within the transition from two lanes to one." CalTrans did not reply to these lists of undisputed facts. It filed objections to certain evidence submitted by plaintiffs, but not these deposition excerpts. Therefore, plaintiffs' assertions were undisputed.

Third, CalTrans does not cite to any contradictory evidence. It refers to a contention in Burkowski's complaint that " 'the two southbound passing lanes did not extend past the intersecting Green Oaks Way.' " This only alleges the lanes did not extend *past* the intersection, however. Furthermore, Burkowski's other allegations in the same paragraph suggest she did not intend her reference to lanes as a reference to the transition area. As we have discussed, she also alleged that the "lanes . . . merge to a single lane . . . where vehicles making left turns onto the intersection road would occur" and referred to a "taper or transition area."

CalTrans also refers to a 2008 traffic investigation report by Caldwell included in Burkowski's opposition papers, in which Caldwell stated, " '[T]he geometrics . . . are such that *southbound passing lane ends just before the intersection,*' " and to a diagram included in this report. The diagram depicts a passing lane that ends, followed by a tapering of the road that extends at least to the Green Oaks Way intersection. Therefore, this evidence undermines, rather than supports, CalTrans's contention.

18

Finally, CalTrans cites, without further discussion, to photographs submitted by plaintiffs as part of their oppositions and supplemental oppositions. These do not establish that the intersection is not within the transition area either.

**D. *CalTrans's Data Regarding the Absence of Prior Accidents is Insufficient***

CalTrans's third reason why it established the reasonableness of the design is that there were no prior similar accidents in the vicinity of the collision, which contention it bases on Ryan's declaration statements about his review of various data. CalTrans, although it discussed this evidence in its opening briefs below, did not cite it in its separate statement as support for the reasonableness of the design, and the trial court did not rely on it for its reasonableness determination. Nor do we.

CalTrans discusses two cases cited in section 12.71 of the California Tort Liability Practice (Cont.Ed.Bar 4th ed. 2011) regarding reasonableness of design (*id.* at p. 958), both by Division Three of this district, to assert this data constitutes substantial evidence of the reasonableness of design. Both are distinguishable from the present circumstances.

In the case CalTrans principally relies on, *Callahan v. City and County of San Francisco* (1971) 15 Cal.App.3d 374, Division Three affirmed the trial court's grant of summary judgment, primarily because there was a complete absence of evidence of a dangerous condition. (*Id.* at pp. 378-379.) In a brief discussion in dicta at the end of the opinion, the *Callahan* court also concluded summary judgment was appropriate based on design immunity. (*Id.* at p. 380.) It referred to evidence "that in the course of four and one-half years there was only one accident per 685,000 cars," which, the court observed, were statistical facts that "fortify the conclusion that reasonable discretion and judgment were exercised by those in authority who approved the plan and design prior to construction." (*Ibid.*) Thus, the *Callahan* court did not rely on accident history primarily, or alone, for the conclusion it reached in this dicta. This is hardly support for an argument that we should rely on CalTrans's data entirely here.

Furthermore, we consider CalTrans's data in the context of its entire evidentiary submission in support of its initial burden. (See, e.g., *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [generally, a court determines whether there is substantial

19

evidence based "*on the entire record*"].)  The *Callahan* court did not face the present circumstances, in which the moving party, CalTrans, in its moving papers relied primarily on expert opinion evidence that was insufficient, including because the material asserted as relevant by the expert (in exhibit N) undermined the substantiality of his conclusory assertions.  *Callahan*, therefore, is unpersuasive.

Indeed, despite the *Callahan* court's brief reference to accident history statistics to "fortify" its conclusion in dicta, we are skeptical about the relevance at all of CalTrans's data in determining whether it met its initial burden regarding reasonableness of design.  Section 830.6 directs us to ask, regarding the third element of the design immunity defense, whether a reasonable public employee or public body "could have" adopted the design in question.  (§ 830.6.)  Accident history following the adoption of a design did not exist when the design was considered.  Hence, it could not have been considered by the adopting employee or body.  Therefore, we question whether it should be considered now on the question of reasonableness of design.

CalTrans also cites *McKray v. State of California* (1977) 74 Cal.App.3d 59, in which Division Three affirmed a trial court's grant of summary judgment in the state's favor for lack of evidence of the existence of a dangerous condition on a highway that lacked guard rails.  In summarizing the evidence submitted by the state, the court referred to declarations stating "that no accidents had occurred on this highway section during the five and one-half years for which statistics were available, and that no complaints about this roadway had been received," and that 21 million cars had traveled the southbound lanes of the highway in that period.  (*Id.* at p. 62.)  However, the court's holding that a dangerous condition could not be established did not rely on this evidence.  (*Id.* at p. 63.)  Furthermore, the court did *not* rule on the state's assertion of a design immunity defense.  (*Ibid.*)  Therefore, *McKray* is not on point.

**DISPOSITION**

We conclude CalTrans, the moving party, did not meet its initial burden of production regarding whether there was substantial evidence of the reasonableness of the roadway design.  In light of our conclusion, we do not address the other issues raised by

20

the parties, such as their debates regarding the reasonableness of other design elements, including the length of the transition area and questions about delineators and signage; whether or not CalTrans met its burden regarding the second element of the design immunity defense, including whether or not discretionary approval had to be "knowing"; and whether or not any postcollision remedial measures taken by CalTrans should be considered in evaluating CalTrans's motion for summary judgment.

The judgment is reversed and this matter remanded to the trial court for further proceedings.  Plaintiffs are awarded costs of appeal.


_____
                                                          Brick, J.*


We concur:


_____
Kline, P.J.


_____
Haerle, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.