Filed 1/10/17 Unmodified opinion attached

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GENOVEVO GONZALES, et al., | |
| Plaintiffs and Respondents, | F070832 |
| v. | |
| CITY OF ATWATER, | (Super. Ct. No. CV002234) |
| Defendant and Appellant, | |
| MICHELLE CARRIZALES, | |
| Defendant and Respondent. | **MODIFICATION OF OPINION** **(NO CHANGE IN JUDGMENT)** |

**THE COURT:**

It is hereby ordered that the opinion filed herein on December 15, 2016, be modified as follows:  On page 31, at the end of the sentence just before the Disposition, delete footnote 19.

Except for the modification set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

_____

GOMES, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

KANE, J.

Filed 12/15/16 Unmodified opinion

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GENOVEVO GONZALES, et al., | F070832 |
| Plaintiffs and Respondents, | (Super. Ct. No. CV002234) |
| v. | |
| CITY OF ATWATER, | **OPINION** |
| Defendant and Appellant, | |
| MICHELLE CARRIZALES, | |
| Defendant and Respondent. | |

-ooOoo-

APPEAL from a judgment and order of the Superior Court of Merced County. Donald J. Proietti, Judge.

Murphy, Campbell, Alliston & Quinn, George E. Murphy and Suzanne M. Nicholson, for Defendant and Appellant City of Atwater.

Powers Miller, R. James Miller and Robert F. Bennett, Jr. for Defendant and Respondent Michelle Carrizales.

Dreyer Babich Buccola Wood Campora, Roger A. Dreyer and Stephen F. Davids, for Plaintiffs and Respondents.

-ooOoo-

In December 2010, Michelle Carrizales was making a left turn at an intersection in the City of Atwater (City) when she struck and killed Delia Gonzales, a pedestrian in a crosswalk. Gonzales's husband and five adult children (collectively plaintiffs) sued Carrizales and the City for wrongful death, alleging Carrizales was negligent and the City was liable under Government Code section 835[1] for the dangerous condition of the intersection. A jury trial was held, at which the jury found Carrizales not negligent and the City solely liable based on the dangerous condition of the intersection; the jury awarded plaintiffs approximately $3.2 million in economic and non-economic damages. In its motion for judgment notwithstanding the verdict (JNOV), the City renewed an argument it made on its unsuccessful motion for directed verdict that the design immunity defense of section 830.6 shielded it from liability. The trial court denied the JNOV.

On appeal from the judgment and order denying its JNOV motion, the City challenges the jury's finding that the intersection was in a dangerous condition and asserts it established the design immunity defense as a matter of law. The City also attempts to challenge the jury's finding that Carrizales was not negligent and contends the non-economic damages awarded plaintiffs were excessive. Since we agree with the City that the design immunity defense insulates it from liability for any dangerous condition of the intersection, we do not reach the other issues the City raised and reverse the judgment against the City.

---

[1] All further statutory references are to the Government Code unless otherwise specified.

# FACTUAL AND PROCEDURAL BACKGROUND

I. The Factual Background

 A. The Intersection

Bellevue Road, an east-west thoroughfare through the City, has two lanes in each direction. Linden Street, which intersects Bellevue, is a north-south collector road with one lane in each direction that provides access to the residential area south of Bellevue. Directly north of the intersection is the main driveway serving a Kmart shopping center. Because an elementary school is less than two blocks away, the intersection has three yellow crosswalks – two that run east and west across the Kmart driveway and Linden, and one that runs north and south across the west side of Bellevue.

 B. The 2001 Plans

Before 2001, the intersection did not have signals; the side streets – Linden and the Kmart driveway – were controlled by stop signs, while Bellevue was not. In February 2001, the transportation consulting firm Fehr & Peers (F&P) completed a warrants study[2] for the City of four intersections along Bellevue, including where Bellevue intersects Linden, to evaluate the need for traffic signals. Based on the study, F&P concluded that a signalized intersection was warranted at Bellevue and Linden, as two warrants for signalization were met: (1) interruption of continuous flow; and (2) "four-hour volume." Warrants for minimum vehicular volume (which tested for the amount of traffic on Bellevue and Linden), minimum pedestrian volume (which looked at the relationship between vehicular traffic volumes and the number of pedestrians crossing the intersection), and 12-month accident history were not met at that time.

Frank Lozano, a civil engineer licensed by the State of California who was employed by the City as its civil engineer from 1999 to 2002, reviewed the warrants

---

  [2] A warrants study is an analysis of state guidelines, called warrants, that cover things such as traffic volume, collisions, and school-related issues, to determine whether signalization is appropriate.

study.  Based on the study, the City council approved the installation of signals at the subject intersection and retained F&P to design the plans.

Robert Rees, a registered civil and traffic engineer who had worked at F&P since 1995, was in charge of the project – he oversaw his staff in the design of the signals, and preparation of the plans, specifications and estimate.  According to Rees, F&P's practice was to meet with the City to obtain information, such as the traffic signal's purpose and role, as well as the City's local preferences, including the signal phasing typically used in the community.  Based on that information, as well as a field survey, F&P would develop a preliminary set of plans that included the basic equipment and layout of the phasing, including the location, poles and signals.  The City would then review the plan and make technical comments, with the review process being repeated until the City and F&P concurred the plans were complete.

The plans F&P developed called for permissive phasing for north and southbound traffic, which meant that vehicles traveling north on Linden and south from the Kmart driveway had a green ball signal at the same time.  There were no left-turn signals for that traffic; instead, vehicles turning left were required to yield on green and turn when safe to do so.  This required northbound drivers to proceed into the intersection, watch for oncoming traffic and check for pedestrians before executing their turns.  In contrast, left-turning traffic on Bellevue had a protected left turn signal, meaning that such traffic would move only on a left green arrow.

Rees stamped the plans in March 2001, which meant that he generally reviewed, approved of them, and agreed with all aspects of their engineering design as of that date.  Rees did not have an independent recollection of the project or conversations he had at the time concerning the plans or whether permissive phasing was discussed.  Rees did not personally prepare the light phasing; that was the responsibility of a former F&P employee, Lisa Phillips, who worked under Rees and left the firm in 2003 or 2004.  Phillips, however, would not have been responsible for selecting the phasing, as phasing

4.

was typically a city recommendation or direction. Based on his practice, Rees believed the City would have selected the permissive phasing for this project.[3] At trial, Rees testified he stood by the use of permissive phasing in the plans; he would not have signed the plans had he thought permissive phasing was inappropriate or unreasonable. F&P regularly used permissive phasing on the projects Rees worked on that involved major thoroughfares with minor streets intersecting them.

Lozano, along with his technical staff, reviewed the plans for the City and engaged in the interactive process with F&P that led to the finalization of the plans. Based on his custom and practice, Lozano would have reviewed the plans in their entirety, including the light phasing, and discussed the use of permissive signals with F&P before approving the plans.[4] When Lozano reviewed the final plans, he determined they were reasonable from an engineering standpoint; the plans met or exceeded all engineering standards. As the City's engineer, Lozano would have been the one to decide on the type of phasing to use; he would have to look at the plans and what was being called for in order to exercise his judgment in confirming the phasing was what he wanted.[5] Lozano approved the plans on May 4, 2001.

---

[3] Rees testified that any F&P documents that would have memorialized conversations concerning the project would have been destroyed in the ordinary course of business after seven or 10 years, with F&P retaining only final copies. On this project, the existing documents consisted of invoices and the design plans.

[4] Lozano did not have an independent recollection of this project or his interactions with F&P regarding it. He also did not recall any conversation he had with anyone about the project, as it had been too long. He testified as to what he knew he would have done according to his custom and practice as the City engineer.

[5] Lozano did not know the name of the F&P engineer who did the traffic phasing portion of the plans and could not say that he ever spoke with that person. Lozano confirmed there was nothing in the project file the City gave to him that documented he ever had a conversation with an F&P engineer where he "actually looked at it and made an engineering judgment call for permissive phasing." Lozano also confirmed there was no document that showed he and David Taylor, a civil engineering technician for the City

On Lozano's recommendation, the City council approved the plans and authorized the call for bids to build the traffic signal at a January 22, 2001 meeting.[6]  Sometime thereafter, the traffic signals were installed according to the plans.

C.  The History of the Intersection after 2001

1.  Prior Fatalities

After the signals were installed, vehicles making left-hand turns from Linden onto Bellevue hit and killed two people traveling northbound in the crosswalk that crossed Bellevue in two separate accidents.  The first fatality, in December 2002, 77-year-old John Toews, was riding his bicycle in the crosswalk, while the second, in August 2008, was a pedestrian, 90-year-old Winifred Dutton.  Neither driver saw the victim before hitting him or her.  This was the only intersection with traffic signals in the City in which pedestrian or bicyclist fatalities occurred in a crosswalk.

2.  The 2004 Plans

In February 2004, in response to complaints about congestion in the intersection, the City retained Wilbur Elias, a licensed civil and traffic engineer with his own practice, to prepare engineering plans to change the signals on Linden and the Kmart driveway from permissive to split phasing.[7]  With split phasing, the north and southbound traffic would be split, with the Linden and Kmart driveway signals operating alternately.  This

who worked under Lozano, ever addressed the issue of phasing of the lights for north and southbound Linden.

[6] City clerk Jeanna Del Real did not know how the council approved the plans in January 2001 when Lozano signed the plans in May 2001, and did not know if it was true that the City council was approving the plans before they were final.

[7] Lozano left City employment in October 2002; the City did not employ another engineer until 2008, when it hired Joe Hollstein.  During the time the City was without its own engineer, it could contract with an outside engineer if an engineer's advice was needed.  The City always had an engineering technician on staff between 2005 and 2010, who would let the City know if there was an engineering issue that needed to be addressed.

meant that the Linden left-turn and through traffic would get a green light together, while the Kmart traffic light was red, and then Kmart left-turn and through traffic would get a green light together, while the Linden traffic light was red. Pedestrian traffic across Bellevue would have a walk signal when the Kmart traffic light was green, not when the Linden traffic light was green. According to Elias, although the primary use of split phasing is to reduce traffic congestion in an intersection and it is not intended to address pedestrian-related issues, pedestrian safety is a by-product of split phasing because it eliminates conflict between northbound left-turning vehicles and pedestrians.

Elias submitted a proposal to provide traffic engineering plans for the split phasing to the City in February 2004, at a total cost of $3,500. Elias told the City the plans could be completed within two weeks of receiving a notice to proceed, and explained that the contract work would involve some minor wiring changes and changing some of the signal faces from full-circle to arrows, to tell drivers it is safe to make a left turn without having to wait for oncoming traffic. Two days later, the City issued a purchase order to prepare the plans that listed a project number of "04-6." Elias forwarded the first draft of the traffic signal modification plans to the City in May 2004; in return, he requested a progress payment of $2,625, which the City issued in June 2004. The completed plans were delivered to the City by August 2004, when Elias demanded the final payment of $875, which the City remitted to Elias the following month.

The City never implemented Elias's plan or installed the split phase design. No one at the City knew why the plan was never implemented: the person who would have had that knowledge, Mo Khatami, died before trial.[8] With the engineering done and

---

[8] Khatami was the City's community development director and, for a time, the assistant city manager. While Khatami was not a traffic engineer, he supervised the engineering department until 2006 or 2007. He passed away shortly thereafter.

7.

funding admittedly not an issue,[9] it is possible the plan was not submitted to the City council for construction approval, although if the project was under a certain amount, the community development director or city manager could approve it without council resolution.[10]

### 3. The 2010 Accident

On December 16, 2010, 73-year-old Gonzales was fatally injured when she was hit by a truck driven by Carrizales. Gonzales was crossing Bellevue from south to north in the marked crosswalk when Carrizales made a left-hand turn from northbound Linden onto Bellevue, running right into Gonzales. Carrizales told the officer on the scene that she never saw Gonzales.

## II.     The Procedural Background

Plaintiffs filed a complaint for wrongful death against the City and Carrizales in October 2011. Plaintiffs alleged the City was liable for a dangerous condition of public property, including improper timing or phasing of the signals and failure to provide appropriate signage to alert vehicles to the presence of pedestrians in the crosswalk, and Carrizales was negligent in the operation of her vehicle.

### A. The Summary Judgment Motion

The City moved for summary judgment, arguing, among other things, that it was entitled to design immunity pursuant to section 830.6. The trial court denied the motion.

---

[9] The City admitted that it had sufficient funds to split the signal phase in the fiscal years from 2001/2002 through 2010/2011.

[10] Stanley Feathers, who worked for the City from 2005 to 2011 as its finance director, assistant city manager, and interim city manager, testified that City council approval was not required if a project cost fell below a certain amount, but he could not recall what that amount was. Ryan, the plaintiffs' expert, estimated the cost to install split-phasing ranged from $15,000 to $20,000. Feathers could not recall if that price range required council approval, but thought it was "probably pretty close."

It determined it could not grant summary adjudication on the design immunity defense because there was a triable issue of fact as to the reasonableness of the plan or design.

B. The Jury Trial

A 15-day jury trial was held at which 20 witnesses testified, including expert witnesses Richard Ryan and James Jeffery, who were retained by plaintiffs and the City, respectively.

1. Plaintiffs' Engineering Expert, Richard Ryan

Plaintiffs' engineering expert, Richard Ryan, reviewed the F&P warrants study and plans, and did not see any analysis, conclusion or rationale that showed an engineer made a decision or talked about why permissive phasing was selected for north and southbound Linden. In Ryan's opinion, there should have been an analysis and the decision should not have been automatic. Had Ryan designed the signals, he would have separated the left-turn phase and pedestrian movement through the crosswalk because a left-turn driver tends to focus on oncoming traffic, not pedestrians. When assessing the type of phasing to use at this intersection, the engineer should have looked at its "unique factors," which included: (1) the Kmart shopping center to the north; (2) the T-intersection; (3) the suburban area to the south; (4) the nearby school; and (5) a major thoroughfare through the City. Ryan also would have documented the reasons for his decision, which the standard of care requires.

While Ryan would not have designed the signals the same way, he agreed that the 2001 plans were well-designed, the signals were built the way they were designed, and the permissive signal clearly was an option to be considered. He could not say whether the 2001 plans were reasonable or unreasonable, as he did not have any information regarding how the decision to use a permissive signal on Linden and a protected signal on Bellevue was made. Ryan opined that the signals should have been either all protected or split phase, not protected in one direction and permissive in the other. This was his personal decision based on what he knew from 2001; he could not judge the 2001 plans

9.

because maybe the designer knew something he did not know. If an engineer had written down his or her thought process, Ryan could have rendered an opinion regarding the reasonableness of the 2001 plans; the City, however, had not provided any document that reflected any kind of engineering judgment.

Ryan was unaware of any "cookbook" an engineer could consult which states special consideration need be given to the factors he cited; instead, signal design is part of "engineering judgment" derived from being knowledgeable about the issues around signal phasing, design and operation. In this case, the presence of generators for pedestrians, such as Kmart, the school and the residential area, should have been considered, as well as the aging United States population and that there are more pedestrians today than ever before as people are more health conscious. Ryan agreed there is no warrants analysis for split phasing, although there are some guidelines, and no standard or specifications that require the use of split phasing. Instead, it is a judgment call based on what the engineer sees.[11]

### 2. Elias's Testimony on Reasonableness

As pertinent here, Elias, who plaintiffs called as a witness in their case-in-chief, testified that the 2001 plans were reasonable engineering plans when they were made. The presence of yellow crosswalks, a shopping center to the north, or the residential area to the south, did not change his opinion that the plans were reasonable, as those were not unusual features. The aging population also would not change his opinion as to reasonableness. The plan was not rendered unreasonable merely because a driver turning left through the crosswalk may approach from behind a pedestrian crossing northbound in the crosswalk, as that happens all the time, and that was pretty typical or commonplace in terms of these kind of designs.

---

[11] During Elias's testimony, plaintiffs' counsel stated that plaintiffs' position was that the use of split-phasing was an "engineering judgment issue" and not something that was required.

According to Elias, split phasing is an exception when it comes to traffic signal design. Ninety percent of the State's lighted intersections use permissive phase signals; the split phase design is generally reserved for intersections with unique physical characteristics not present here.

### 3. Plaintiffs' Concession on Reasonableness

F&P engineer Rees testified as part of the City's case. During a break in Rees's testimony on direct examination, the parties and trial court discussed the subject matter of his testimony outside the jury's presence. During an in-chambers conference, plaintiffs' attorney objected to Rees rendering opinions, which the City asserted he could do because it had designated him as a non-retained expert. Plaintiffs' attorney, Roger Dreyer, explained that during Rees's deposition as F&P's person most knowledgeable, Rees's attorneys instructed him not to answer questions that asked for opinions and took the position that he would not render any. Thereafter, the City disclosed Rees as a non-retained expert, but plaintiffs did not re-take his deposition. Dreyer argued that because the City did not disclose Rees as a retained expert, it was stuck with his position that he was not going to render any opinions.

The court asked the City's attorneys, Bradley Post and Stephanie Wu, whether they were going to ask Rees to render opinions on subject matters he refused to respond to during his deposition. Post responded they were, and explained that Rees did not render opinions because his deposition had been noticed as the "person most knowledgeable." Post added that after Rees was designated as a non-retained expert, plaintiffs had every opportunity to re-take his deposition, but chose not to.

The trial court disagreed with the City's position, but thought the issue was premature since it did not know what Rees would be asked. The court gave Post the option of making an offer of proof. Post stated he intended to ask Rees about the following areas: (1) whether the 2001 plans were reasonable in Rees's mind, because he was the one who drew them up and approved them; (2) Rees's custom and practice

11.

regarding discussing issues with a city engineer; (3) whether permissive light phasing is common; and (4) whether the plans met or exceeded all standard specifications when Rees stamped, signed, initialed and approved them. Dreyer responded that plaintiffs were precluded from asking those questions at Rees's deposition.

The trial court asked whether the ultimate issue of whether the plans were reasonable was a question of fact for the jury. When Post and Wu responded it was not, the trial court asked if it was a question of law for the court. Post stated that it "all comes down to the design immunity. That's really the purpose of – [.]" The trial court interrupted, stating that was a "good comment to break off on[,]" and asked if there was "a contention by the plaintiff in this case that the 2001 design, when it was adopted and approved, is unreasonable?" Dreyer responded: "No, Your Honor." The trial court added: "So we don't have a material issue there." The trial court discussed the remaining areas of inquiry and allowed Dreyer to explain his objections further. The trial court then ruled: "I understand. All right. So the – whether the plans were reasonable, that's not an issue. Whether it was stamped and sealed and what that means, that's already been testified to by Mr. Lozano. It doesn't seem to be a relevant issue either. It doesn't seem material since there's no dispute the plans are reasonable at the time they were approved. So the only question is whether or not he can testify as to the light phasing being a common practice back in 2001. I'm going to permit him to testify to that since it's already in the record. It's cumulative, so let's not spend a lot of time on it."

4. The City's Engineering Expert, James Jeffery

The City's expert, James C. Jeffery III, a licensed traffic and civil engineer, testified that there are no warrants studies or check-the-box forms to use to figure out what type of signal, protective or permissive, should be installed. Instead, there are guidelines used to determine the type of signal to install, which require the use of one's engineering judgment in interpreting and applying them. One such guideline is the

12.

Manual of Uniform Traffic Control Devices (MUTCD), which provides guidelines and options engineers may use when installing or modifying signals.

Jeffery relied on a portion of the MUTCD in forming his opinion regarding whether the signalization at the time of the incident was appropriate, which states that a protected left turn phase should be considered where certain alternatives could not be utilized and certain conditions exist. None of the alternatives – prohibiting left turns, making geometric changes to eliminate the turn, or providing protected-permissive or permissive-protected left turn operation – were feasible. Since none of the alternatives could be used, the following conditions should have been considered: (1) five or more left turn collisions for a particular left turn movement in the prior 12-month period; (2) left-turn delay of one or more vehicles waiting at the beginning of the green interval or still remaining in the left turn lane a certain percentage of the time; (3) new development; and (4) miscellaneous items, such as impaired sight distance or an offset intersection. None of these conditions, however, existed in 2010.

In Jeffery's opinion, the 2001 plans and F&P warrants study speak directly to the decision-making process used to select permissive phasing in 2001. Based on the warrants study, a decision was made to install a signal at the subject intersection and to prepare plans to effectuate the signal. Jeffery was not aware of any requirement that engineers document all of their mental processes when making an engineering decision. In Jeffery's opinion, the phasing had nothing to do with the fact that there is a commercial development to the north, a residential area to the south, a school or an aging population, as none of these are unique features; instead, the intersection was like almost any other place where signals are installed except industrial areas or the like. As such, there was nothing wrong with having permissive phasing in 2010. Jeffery opined that the intersection as it existed immediately after the 2002 accident was not dangerous, split phasing was not required at that time and he would not have recommended it.

13.

C. The Motion for Directed Verdict

At the close of the evidence, the City moved for a directed verdict on the grounds that the undisputed evidence established it was entitled to design immunity as to the 2001 plans under section 830.6, which encompassed all of plaintiffs' claims, as well as immunity under section 830.4. During arguments on the motion, the trial court asked how the approval of the 2004 modification affected design immunity for the 2001 plans. The City's attorney, Wu, responded it would not, unless there was a physical change in condition; the trial court agreed that was not the case, since plaintiffs' attorney, Dreyer, stated at the outset that plaintiffs were not contending there was a change in physical condition. The trial court further agreed that the motion would be well-taken if the City had relied on the 2001 design and done nothing until after the 2010 accident, but it appeared the design immunity that existed in 2001 was lost when the 2004 design modification was approved, but it was never implemented even though there was money to fund it.

The trial court later explained its problem: since the intersection in 2010 did not conform with the 2004 plans, which were an approved modification, it appeared that design immunity was lost with the modification. The trial court asked counsel whether there was a published decision that addressed that situation. Wu responded she had not looked at it, but she would. Following further argument concerning whether the 2004 plans were approved, the trial court found there was sufficient evidence to find that the 2004 plans had been approved, as there was a formal engineering design which a person in authority, Khatami, approved on the City's behalf, and all indications were that everything had been done except actually implementing it. Based on that and the other discussions on the issue, the trial court denied the motion.

D. The Jury's Verdict

The jury returned a special verdict in plaintiffs' favor. It found that the intersection was in a dangerous condition at the time of the incident, the condition created

a reasonably foreseeable risk that this kind of incident would occur, the City had notice of the dangerous condition long enough to protect against it, and the dangerous condition was a substantial factor in causing plaintiffs' harm. As to Carrizales, the jury found she was not negligent, and assigned 100 percent of the responsibility for plaintiffs' harm to the City. The jury awarded plaintiffs $3,214,134 in damages comprised of $14,134 for funeral and burial expenses, $1.2 million for past non-economic losses, and $2 million for future non-economic losses.

E.       The Motions for JNOV and New Trial

After judgment was entered, the City moved for JNOV and a new trial. In the motion for JNOV, the City sought to set aside the judgment and to enter judgment in its favor on a number of grounds, including that it was entitled to immunity under sections 830.4, 830.6 and 830.8, and there is no evidence to support a finding that the City lost its design immunity under section 830.6. In the motion for a new trial, the City alternatively asked the trial court for a new trial as to design immunity should the trial court deny the JNOV, as its denial of the motion for directed verdict was against the law. Plaintiffs filed written opposition to both motions.

Following oral argument on the motions, the trial court denied them both. On the motion for JNOV, the trial court explained that it denied the City's motion for directed verdict, not because it felt the City had forfeited the original design immunity due to a change in physical condition, but because the City approved a different design which it did not implement and therefore the intersection did not conform with the 2004 design at the time of the accident. Thus, the forfeiture was the City's changing the design but not building it, even though it had plenty of money to do so. In response, the City's attorney argued there was no case law that would support a finding that the 2001 design would not provide immunity even if the 2004 plans were approved.

When Wu asked the trial court if it agreed the City had design immunity for the 2001 plans, the trial court responded that it never decided whether the plans were

15.

reasonable, but if they were, there was a presumption of immunity since the plans were approved and implemented. The trial court, however, explained that it never got to immunity for the 2001 plans because it was looking at whether the intersection as it existed in 2010 complied with the approved 2004 plans.

With respect to reasonableness, Wu asserted plaintiffs conceded that issue during trial, which was why the City did not argue the issue or present further evidence about it. Wu argued that if reasonableness was the only undetermined element that prevented the trial court finding design immunity, plaintiffs had conceded the issue, and if design immunity vested in 2001 after the signals were constructed, the only way it would no longer apply is if it were lost. Design immunity, however, could not have been lost because there had not been a change in physical condition and the 2004 design was not built.

Dreyer agreed with the trial court's analysis and asserted it did not need to reach the issue of immunity for the 2001 plans because the City had a new plan. Dreyer asserted he never agreed the City had immunity for the 2001 plans or that those plans were reasonable, claiming the issue was that the City never acted on the 2004 plans, even though they were approved, due to the City's dysfunction. Dreyer wanted to make plaintiffs' position "very clear" "that we never had to deal with this issue of reasonableness, and it was that conversation just to get to the 2004 when we had the hearing on this issue."[12] Dreyer also asserted hiring Elias to draw up the 2004 plans demonstrated the City lost confidence in the 2001 design.

When Wu pointed out that the reporter's transcript showed that Dreyer conceded the 2001 plans were reasonable during Rees's testimony, not during the motion for directed verdict, Dreyer responded that at the time, they were dealing with "that discrete

_____

[12] In plaintiffs' written opposition to the motion for JNOV, plaintiffs stated they conceded reasonableness "[d]uring oral argument on the motion for nonsuit *only*."

16.

issue, and we already had all of the evidence relative to the plan of 2004. It's not – it's an overstatement in terms of how they're arguing it." After Dreyer argued further on other issues raised, the trial court denied both the motion for new trial and motion for JNOV.

## DISCUSSION

While the City raises a number of issues on appeal, we address only one – the design immunity of section 830.6 – as we conclude it is dispositive of this appeal.[13]

I. General Principles Governing Design Immunity

"Under the Government Claims Act, '[a] public entity is not liable for an injury.' '[e]xcept as otherwise provided by statute.' " (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347 (*Hampton*).) "The Government Claims Act (Act) provides for direct liability on the part of public entities for injuries caused by maintaining dangerous conditions on their property when the condition 'created a reasonably foreseeable risk of the kind of injury which was incurred' and either an employee's negligence or wrongful act or omission caused the dangerous condition or the entity was on 'actual or constructive notice' of the condition in time to have taken preventive measures.' " (*Id.* at pp. 347-348; see § 835.)

Even if a dangerous condition is demonstrated, a public entity may still prevail through a variety of statutory immunities, which the public entity may assert as an affirmative defense. (*Hampton*, *supra*, 62 Cal.4th at p. 348.) The present case concerns the affirmative defense of design immunity under section 830.6.[14] (*Cornette v.*

---

[13] The City challenges the jury's finding of a dangerous condition, contending that the signal design did not constitute a dangerous condition as a matter of law. We do not decide the issue, however, because even if the signal design was a dangerous condition, the City is immune from liability under section 830.6.

[14] Section 830.6 provides, in relevant part: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to

17.

*Department of Transportation* (2001) 26 Cal.4th 63, 68-69 (*Cornette*) [In actions arising out of an alleged dangerous condition of public property, under section 830.6, a "public entity may escape such liability by raising the affirmative defense of 'design immunity.' "].) "A public entity claiming design immunity must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan of design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Id.* at p. 66.) "The rationale for design immunity is to prevent a jury from second-guessing the decision of a public entity by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan or design." (*Id.* at p. 69.)

Design immunity is often raised on a motion for summary judgment or nonsuit, thereby enabling the trial court to find the defense established as a matter of law. (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939-940 (*Grenier*).) "The first two elements, causation and discretionary approval, may only be resolved as issues of law if the facts are undisputed." (*Id.* at p. 940.)

The third element, whether there is any substantial evidence of the reasonableness of the public entity's approval of the plan or design, is a question statutorily reserved for the court, not a jury. (*Cornette*, *supra*, 26 Cal.4th at p. 72; § 830.6.) The "trial or

give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." The statute contains additional language that "governs circumstances under which design immunity may be lost when the danger arises out of a change in physical conditions of which the entity had notice and as to which it had time to obtain funding for and perform remedial work or provide appropriate warnings." (*Hampton*, *supra*, 62 Cal.4th at p. 348.)

appellate court" is required to determine whether "there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." (§ 830.6; *Cornette*, *supra*, 26 Cal.4th at p. 72.) The court is "not concerned with whether the evidence of reasonableness is undisputed; the statute provides immunity when there is substantial evidence of reasonableness, even if contradicted." (*Grenier*, *supra*, 57 Cal.App.4th at p. 940.) The public entity must be granted immunity as long as reasonable minds can differ concerning whether a design should have been approved; " '[t]he statute does not require that property be perfectly designed, only that it be given a design which is reasonable under the circumstances.' " (*Id.* at p. 941.)

The City appealed from the order denying the motion for JNOV. A trial court must render JNOV whenever a motion for directed verdict for the aggrieved party should have been granted. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*); Code Civ. Proc., § 629.) A trial court may grant a motion for JNOV only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support it. (*Sweatman*, *supra*, 25 Cal.4th at p. 68.) The standard of review on appeal is the same as that in the trial court – whether any substantial evidence, contradicted or uncontradicted – supports the jury's conclusion. (*Ibid.*) Where, as here, a motion for JNOV raises legal issues, such as the application of law to undisputed facts or the interpretation of a statute, we review the trial court's ruling "under a de novo standard of review." (*Ibid.*; see *Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 829-830; *Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 710, 718-719.)

Since the parties agree that the first element – a causal relationship between the design and the fatality – has been satisfied, the present case concerns the second and third

19.

elements of design immunity set out in section 830.6 – discretionary approval and reasonableness.

## II. Discretionary Approval

We begin with discretionary approval. This " 'simply means approval in advance of construction by the legislative body or officer exercising discretionary authority.' [Citation.] A detailed plan, drawn up by a competent engineering firm, and approved by a city engineer in the exercise of his or her discretionary authority, is persuasive evidence of the element of prior approval." (*Grenier*, *supra*, 57 Cal.App.4th at p. 940.) Discretionary approval need not be established with testimony of the individual who approved the project. (*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 730-731, disapproved on another point in *Cornette, supra,* 26 Cal.4th at pp. 73-74 & fn. 3.) A former employee may testify to the entity's "discretionary approval custom and practice" even if the employee was not involved in the approval process at the time the challenged plan was approved. (*Id.* at p. 732.)

Here, the City presented undisputed evidence that the 2001 plans were designed by professional engineering firm F&P, reviewed and approved by city engineer Lozano, who had the discretionary authority to approve the plans, and approved by the City council. The 2001 plans consist of detailed drawings of the intersection where the accident occurred, including the light phasing and signage. This evidence demonstrates the discretionary approval element as a matter of law. (See, e.g., *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1263 (*Laabs*) [evidence that an engineer employed by the public entity "reviewed and approved" construction plans established discretionary approval element as a matter of law]; *Grenier*, *supra*, 57 Cal.App.4th at p. 941 [city established discretionary authority element as a matter of law where "plans were prepared by Saguchi, a civil engineer, and approved by Alvarado, the city engineer, after review"]; *Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 525 [discretionary approval element established as a matter of law where "the City's

20.

engineer, along with the engineers and other officials of the county who were recognized as being competent in the design of highways, approved the design before it was adopted by the City"].)

Plaintiffs contend that to establish "approv[al]" by one "exercising discretionary authority" (§ 830.6), the City also was required to present evidence of a "deliberat[ive] process that resulted in the exercise of judgment[,]" such as data or analysis of why permissive phasing was used. They assert that without proof of a decision or an explanation of what the City considered in 2001 regarding the appropriateness of permissive left turns, there is no evidence that an actual discretionary decision was made to use permissive phasing and therefore no design immunity. Plaintiffs recognize that experts Ryan and Jeffery disagreed on whether split phasing was appropriate, but assert that design immunity does not attach unless there is evidence that either the City or Rees contemplated the same issues as the experts.

Our Supreme Court recently rejected a similar claim in *Hampton*, *supra*, 62 Cal.4th 340. There, the plaintiffs, a driver who was seriously injured in an automobile accident at an intersection and his wife, sued the County of San Diego for a dangerous condition of public property, alleging the design and construction of the intersection afforded inadequate visibility under applicable county design standards. (*Id.* at pp. 343-344.) The county moved for summary judgment based on design immunity, arguing the discretionary approval element was satisfied based on a county traffic engineer's declaration which described the approval process for the intersection's plans: before construction, a licensed civil and traffic engineer in charge of the county's design engineering section, and to whom the county board of supervisors delegated discretion and authority to approve plans, signed the plans; and after the project was completed, another licensed civil engineer, who served as senior civil engineer of the design engineering section, approved and signed the as-built plans. (*Id.* at pp. 344-345.) In opposing the motion, the plaintiffs asserted there were disputed issues of fact regarding

21.

discretionary authority as the plans did not show a raised embankment that the plaintiffs claimed rendered visibility inadequate under applicable county standards. (*Id.* at p. 345.) The trial court granted the motion, as the county established all three elements of design immunity—discretionary approval was established through evidence that the engineer who approved the plans had the discretion and authority to do so, and another engineer signed off on the as-built plans. The appellate court affirmed. (*Id.* at pp. 346-347.)

Before the Supreme Court, the plaintiffs challenged the discretionary approval element. They contended that " 'approv[al]' by one 'exercising discretionary authority' (§ 830.6), requires an exercise of discretion in the sense of an exercise of judgment or choice, and that, in their words, 'one cannot truly exercise judgment or make a choice without an awareness of what is to be judged or chosen.' " (*Hampton*, *supra*, 62 Cal.4th at p. 348.) The plaintiffs asserted an engineer can only truly make a discretionary decision to approve a design, despite its nonconformity to governing standards, if the engineer realizes the nonconformity; " '[b]y contrast, an engineer who approves a nonconforming design on the mistaken belief it conformed to governing standards has acted through inadvertence, not discretion.' " (*Id.* at pp. 348-349.)

The Court disagreed, as the plaintiffs' claim was essentially that there was an abuse of discretion, which is considered under the reasonableness element of the statute, not the discretionary approval element. (*Hampton*, *supra*, 62 Cal.4th at p. 349.) The Court looked first at the statutory intent, noting that "[t]he Law Revision Commission (Commission) comment regarding section 830.6 describes the provision as 'provid[ing] immunity where a governmental body exercises the discretion given to it under the laws of the State in the planning and designing of public construction and improvements. . . .' " (*Id.* at p. 349.)

The Court noted another Commission statement "suggests that the discretionary approval element of section 830.6 does not call for a jury to examine whether the employee who approved a plan realized that the plan deviated from applicable

standards." (*Hampton*, *supra*, 62 Cal.4th at p. 349.) The Court explained that statement, which reflects legislative intent, "indicates that the law's purpose is to avoid the dangers involved in permitting reexamination and second-guessing of governmental design decisions in the context of a trial: 'While it is proper to hold public entities liable for injuries caused by arbitrary abuses of discretionary authority in planning improvements, to permit reexamination in tort litigation of particular discretionary decisions where reasonable men may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decision has been vested.' " (*Ibid.*) Plaintiffs' interpretation of the statute ran afoul of this purpose, as their interpretation "would implicate the adequacy of the deliberative process at the discretionary approval stage and would lead a jury into just the sort of second-guessing concerning the wisdom of the design that the statute was intended to avoid." (*Id.* at pp. 349-350.)

The *Hampton* plaintiffs' interpretation also conflicted with the statutory language, which " 'provides that the discretionary element may be established *either* by evidence of appropriate discretionary approval *or* evidence that the plan conformed with previously approved standards. (§ 830.6 ["Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design . . . where such plan or design has been approved . . .by some . . . employee exercising discretionary authority to give such approval *or* where such plan or design is prepared in conformity with standards previously so approved . . . ." (italics added)].)' That the statute permits, as one alternative, that the discretionary approval element may be established through proof that the design complies with discretionarily approved standards suggests that the other alternative, that is, discretionary approval by the appropriate employee, does not require evidence of the employee's awareness of and compliance with standards." (*Hampton*, *supra*, 62 Cal.4th at p. 350.)

23.

Section 830.6's structure as a whole supported the Court's interpretation, as "once causation and approval by an authorized employee or compliance with appropriately adopted standards is established, there is immunity so long as 'the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor.' (§ 830.6.)  This three-part structure implies that the wisdom of the design is evaluated – by the court – under the reasonableness element of the immunity statute, and not under the element asking a jury to decide whether an employee vested with discretion to approve the plans actually approved them." (*Hampton*, *supra*, 62 Cal.4th at p. 350.)

It was plain to the Court that, considered as a whole, section 830.6 "was intended to avoid second-guessing the initial design decision adopted by an employee vested with authority to approve it, except to the extent the court determines that the employee's approval of the design was unreasonable[,]" and it was only "at the reasonableness stage that the court would consider whether an employee, in either knowingly or unknowingly approving a design that deviates from applicable standards," adopted a design that a reasonable legislative body or employee could have approved.  (*Hampton*, *supra*, 62 Cal.4th at p. 351.)

The Court also noted practical problems with the plaintiffs' interpretation: "Although objective proof of the fact of approval by an employee with authority to approve the plan may be readily available, evidence of the standards actually considered by the decision makers, as well as the reasoning and motivation of those employees, will be much more scarce with the passage of time.  Plaintiffs' interpretation could produce the anomaly of different immunity outcomes for identical designs depending simply upon the recordkeeping ability of the public entities involved, or the availability of employees who are able to remember the decisionmaking process of the persons involved – a

24.

process that may have occurred long before the lawsuit." (*Hampton*, *supra*, 62 Cal.4th at p. 351.)

The Court acknowledged that two appellate court cases supported the plaintiffs' interpretation of the statute. In one of those, *Levin v. State of California* (1983) 146 Cal.App.3d 410 (*Levin*), the complaint for wrongful death of a driver who was killed when her vehicle went over an embankment alleged a dangerous condition because the highway design omitted adequate shoulders or a guardrail near the steeply sloped embankment. There was evidence that the design violated state guardrail standards. (*Id.* at pp. 414-415, 416.) The reviewing court found triable issues of fact on the causation and discretionary approval elements. (*Id.* at pp. 415-418.) With respect to the latter, the court explained: "As our Supreme Court pointed out in *Cameron v. State of California* (1972) 7 Cal.3d 318, 326 [(*Cameron*)], the rationale of the design immunity defense is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design. An actual informed exercise of discretion is required. The defense does not exist to immunize decisions that have not been made. Here, as in *Cameron*, *supra*, the design plan contained no mention of the steep slope of the embankment. The state made no showing that [the engineer], who alone had the discretionary authority, decided to ignore the standards or considered the consequences of the elimination of the 8' shoulder. It follows that the state also failed to establish the second element of the defense." (*Levin*, *supra*, 146 Cal.App.3d at p. 418.)[15]

---

[15] As the Court explained in *Hampton*, in the other case, *Hernandez v. Department of Transportation* (2003) 114 Cal.App.4th 376 (*Hernandez*), the principal question before the appellate court was whether the discretionary approval element is one of fact for the jury or of law for the court. (*Hampton*, *supra*, 62 Cal.4th at p. 355.) After appropriately concluding the element is a jury question, the appellate court appeared to rely on *Levin* for the proposition that summary judgment was inappropriate if there was a dispute in the evidence concerning the factual questions whether the design violated applicable standards and whether responsible officials had knowingly approved a deviation from standards. (*Ibid.*)

Noting that *Levin* and *Hernandez* relied on *Cameron*, the *Hampton* Court explained that *Cameron* is not authority for the interpretation of section 830.6 suggested in those cases.  (*Hampton*, *supra*, 62 Cal.4th at p. 357.)  In *Cameron*, the complaint alleged the plaintiffs' injuries, incurred when they lost control of their car on a highway, were caused by a dangerous condition, namely uneven banking, or "superelevation," on a curve in the road.  (*Cameron*, *supra*, 7 Cal.3d at p. 323.)  The Court reversed an entry of a judgment for nonsuit in favor of the state on its design immunity claim because, although the state had produced evidence that the highway plans were prepared by appropriate county employees and approved by the county board of supervisors, the plaintiffs produced evidence that the superelevation did not appear in the plan, and therefore the uneven superelevation was not the result of the approved design or plan. (*Cameron*, *supra*, 7 Cal.3d at pp. 325-326.)

The *Cameron* Court explained that because the state did not present any evidence that the superelevation was the result of, or conformed to, a design approved by the public entity vested with discretionary authority, "there would be no reexamination of a discretionary decision in contravention of the design immunity policy [of preventing a jury from reweighing the same factors the public entity already considered during its discretionary approval of the design] because there has been no such decision proved. The state merely showed that the . . . Board of Supervisors approved a design showing the course of the right of way and the elevation above sea level of the white center stripe for the road.  The design plan contained no mention of the superelevation intended or recommended.  Therefore such superelevation as was constructed did not result from the design or plan introduced into evidence and there was no basis for concluding that any liability for injuries caused by this uneven superelevation was immunized by section 830.6."  (*Cameron*, *supra*, 7 Cal.3d at p. 326, fn. omitted.)

The *Hampton* Court explained its discussion in *Cameron* of the rationale of design immunity, along with its comment that there had been no discretionary decision on the

superelevation, "were not intended to and did not suggest that, under the discretionary approval element of section 830.6, the public entity bears the burden of demonstrating that its employee considered all potentially applicable standards. Indeed, such a requirement would constitute a surprising retreat from the basic understanding that the discretionary approval element of design immunity asks whether a person vested with discretion to approve the plan did approve the plan or design that was built, and that the question whether it was wise to approve the plan is judged under the reasonableness element of the statute." (*Hampton*, *supra*, 62 Cal.4th at p. 357.) The Court further explained that while it stated in *Cameron* that "the state's engineer declared that 'the design contained in the plans was in accordance with mid-1920 standards of design and was reasonable" (*Cameron*, *supra*, at p. 325), . . . nothing in our statement suggests that, as opposed to being a circumstance that was relevant to the *reasonableness* of the plans at the time they were adopted in 1920, evidence concerning the approving employee's awareness of applicable standards was necessary to the prima facie showing for discretionary approval element." (*Hampton*, *supra*, 62 Cal.4th at pp. 357-358.)[16]

Here, plaintiffs' interpretation of the statute – that proof of how a decision is made is necessary to establish the exercise of discretionary authority – is not supported by the statute's language or intent. As in *Hampton*, plaintiffs' interpretation: (1) would implicate the adequacy of the deliberation process at the discretionary approval stage and lead the jury into second-guessing the wisdom of the design that the statute was intended to avoid; (2) conflicts with the statutory language, as an exercise of "discretionary authority to give such approval" does not entail a conscious weighing of design or plan options, but does require the employee to use discretion in *approving* the plan or design; and (3) presents practical problems, since, as shown true in this case, evidence of what

---

[16] Accordingly, the Court disapproved of *Levin* and *Hernandez* to the extent they are inconsistent with its opinion. (*Hampton*, *supra*, 62 Cal.4th at p. 358.)

the employee with authority to approve the plan actually considered, as well as his or her reasoning and motivations, will be scarcer with the passage of time and could lead to different immunity outcomes for identical designs depending on the public entity's record keeping or employees' memories.

Plaintiffs contend that *Cameron*, *supra*, 7 Cal.3d 318, and *Levin*, *supra*, 146 Cal.App.3d 410, support their interpretation. Their reliance, however, is misplaced; as the *Hampton* Court explained, *Cameron* does not stand for the proposition that the discretionary approval element requires the public entity to demonstrate its employee considered all potentially applicable standards. (*Hampton*, *supra*, 62 Cal.4th at p. 357.) Instead, the discretionary approval element asks whether a person vested with discretion to approve the plan actually approved it, and the wisdom of approving the plan is judged under the reasonableness element. (*Ibid.*)

Plaintiffs contend there is no evidence the City made a decision to adopt permissive phasing as part of the 2001 plans. We disagree, as the fact that permissive phasing was part of the plans shows that a decision was made to use that type of phasing. Even if permissive phasing was adopted by default and no other type of phasing was considered, its use was still a design decision. Plaintiffs' real complaint is the lack of evidence of the deliberative process, but as we explained, that is not required to show discretionary approval. Instead, the wisdom of approving the 2001 plans with permissive phasing is judged under the reasonableness element of section 830.6.

III.    Reasonableness of the 2001 Plans

As discussed above, a public entity claiming a design immunity defense must present substantial evidence supporting the reasonableness of the plan or design. (*Cornette*, *supra*, 26 Cal.4th at p. 69.) Our task "is to apply the deferential substantial evidence standard to determine whether any reasonable [public] official could have approved the challenged design. [Citation.] If the record contains the requisite substantial evidence, the immunity applies, even if the plaintiff has presented evidence

28.

that the design was defective." (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 757.) "The fact of approval by competent professionals can, in and of itself, establish the reasonableness element." (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 187, disapproved on another point in *Cornette, supra,* 26 Cal.4th at pp. 73-74 & fn. 3.) However, "[t]ypically, 'any substantial evidence' consists of an expert opinion as to the reasonableness of the design, or evidence of relevant design standards." (*Laabs*, *supra*, 163 Cal.App.4th at pp. 1263-1264.)

Both parties make arguments regarding whether there was substantial evidence of the reasonableness of permissive phasing in the 2001 plans. We do not reach the merits of those arguments, however, because, as the City points out, the record shows plaintiffs conceded at trial that the 2001 plans were reasonable when they were approved.[17] Contrary to plaintiffs' assertion, both below and on appeal, that the concession was made during post-trial hearings, the concession actually was made in the midst of the City's case-in-chief, during a break in the direct examination of one of its witnesses. While the parties and the court were discussing the scope of the testimony of that witness, plaintiffs' attorney clearly answered "No, Your Honor[,]" when the trial court asked if plaintiffs were contending that the 2001 design was unreasonable when it was adopted and approved. Plaintiffs' attorney also did not correct the trial court when the court stated, soon thereafter, that whether the plans were reasonable was not an issue.

On appeal, plaintiffs attempt to avoid the impact of this concession by asserting their attorney's representation as to their position was inadvertent and a "spontaneous

---

[17] In denying the motions for directed verdict and JNOV on the issue of design immunity, the trial court relied exclusively on its finding that the City approved the 2004 plans, reasoning that there was no immunity because the intersection did not conform to the 2004 plans. While the City addresses this rationale in its opening brief, plaintiffs do not attempt to defend the trial court's ruling on this basis. Instead, plaintiffs assert the 2004 plans are relevant to whether the 2001 plans were reasonable when approved. Since Plaintiffs conceded reasonableness below, however, we do not address the impact of the 2004 plans.

29.

utterance." They claim they argued reasonableness of the 2001 plans through their expert, Ryan, and there is nothing in the record to suggest their attorney's "inadvertently incorrect statement was binding."

We conclude that plaintiffs are bound by the concession and decline to reach the merits of the arguments regarding reasonableness the parties raised in their appellate briefs. Similar to a stipulation, a concession by counsel at trial or judicial admission eliminates the need to prove the fact at issue admitted and is binding on the client absent fraud. (*Horn v. Atchison, T. & S.F. Ry. Co.* (1964) 61 Cal.2d 602, 605-606 [defense counsel's unequivocal invitation to a plaintiff's verdict in opening statement was a concession of liability]; *Bank of America v. Lamb Finance Co.* (1956) 145 Cal.App.2d 702, 708 [no prejudice from jury denial where defense counsel conceded liability on second day of trial]; *Scafidi v. Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 561-562 [counsel's admission at trial eliminated complaint allegation that an accounting had been requested from defendants].)

Since plaintiffs conceded the 2001 plans were reasonable when adopted, the City was not required to prove reasonableness. There is nothing in the record to suggest plaintiffs' attorney's concession was inadvertent or spontaneous. To the contrary, plaintiffs admitted in their written opposition to the City's JNOV motion that they "conceded reasonableness[,]" but asserted it was "[d]uring oral argument on the motion for nonsuit *only*." Plaintiffs inconsistent denials of their attorney's concession belie its truth.

IV.   Conclusion

Since all of the elements of design immunity are established, the City is immune from liability for any dangerous condition of the intersection.[18]   Based on the City's

---

[18] While evidence was produced at trial concerning signs that could have been installed in the intersection to draw drivers' attention to the crosswalk's presence, the

immunity, the judgment against the City cannot stand and we have no choice but to reverse it.[19]

## DISPOSITION

The judgment against the City is reversed.  The matter is remanded to the trial court with directions to enter judgment in favor of the City.  Costs on appeal are awarded to the City.

_____
GOMES, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.

---

City did not lose immunity because those signs were not installed, as signage at the intersection was part of the 2001 design.

[19] We note that the City argued on appeal that should the judgment against it be affirmed, we should find the jury erred in exonerating Carrizales because she was negligent as a matter of law, and remand the matter for an appropriate allocation of fault. The City, however, never filed a cross-complaint against Carrizales.  In the absence of a cross-complaint, the City does not have standing to raise the issue of Carrizales's exoneration because it is not aggrieved thereby.  (*Holt v. Booth* (1991) 1 Cal.App.4th 1074, 1080 ["the exoneration of a joint tortfeasor from liability does not 'aggrieve' the other individually liable tortfeasor(s) insofar as that word is understood to apply to a party's standing to appeal"]; see *Cook v. Superior Court* (1969) 274 Cal.App.2d 675, 679 ["A defendant who is individually liable is not aggrieved by the exoneration, even though erroneous, of a codefendant."].)  Accordingly, while Carrizales filed a respondent's brief and appeared at oral argument through her attorney, the issues concerning her liability cannot be asserted in this appeal and the judgment in her favor must stand.

31.